## CASE NO. 23-1144

# IN THE

# 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 ℭ𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰

## FOR THE FOURTH CIRCUIT

_____

### ESTATE OF KE ZHENGGUANG,

*Petitioner-Appellee,*

v.

### YU NAIFEN STEPHANY, a/k/a Stephany Yu, a/k/a Stephany Naifen Yu, a/k/a Stephany N. Dombrowski,

*Respondent-Appellant.*

_____

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND AT GREENBELT

_____

## OPENING BRIEF OF APPELLANT

_____

Charles Michael
STEPTOE & JOHNSON LLP
1114 Avenue of the Americas
New York, NY 10036
212-378-7604
cmichael@steptoe.com

*Counsel for Appellant*

**LANTAGNE LEGAL PRINTING**
801 East Main Street Suite 100 Richmond, Virginia  23219 (804) 644-0477

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __23-1144__      Caption: __Estate of Ke Zhengguang v. Yu Naifen Stephany__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Yu Naifen Stephany__
(name of party/amicus)

_____

who is ____appellant-respondent____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1. Is party/amicus a publicly held corporation or other publicly held entity? ☐YES ☑NO


2. Does party/amicus have any parent corporations? ☐YES ☑NO
   If yes, identify all parent corporations, including all generations of parent corporations:


3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity? ☐YES ☑NO
   If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?                    ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)      ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?                    ☐YES ☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?         ☐YES ☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: _____          Date: _____2/22/2023_____

Counsel for: Yu Naifen Stephany _____

Print to PDF for Filing

**TABLE OF CONTENTS**

INTRODUCTION ................................................................. 1

JURISDICTIONAL STATEMENT ..................................... 5

ISSUES PRESENTED FOR REVIEW ................................ 6

STATEMENT OF THE CASE ............................................. 7

      A.    The Parties ..................................................... 7

      B.    The 2010 Agreement ...................................... 8

      C.    The Arbitration in Hong Kong ....................... 10

      D.    The Claimants' Infighting and Non-Cooperation Impedes Carrying Out the Award ....................... 11

      E.    Chinese Currency Regulation .......................... 13

      F.    The Estate Can Receive Payment in China ......... 14

      G.    Ms. Yu Files Suit in China to Advance the SJHC Transaction, Only to Face More Obstruction ....... 16

      H.    Ms. Yu Files Claims in Hong Kong to Implement the Award ....................................... 18

      I.    The Hong Kong Court Rejects the Estate's Efforts to Avoid Moving Forward ....................... 19

      J.    Procedural History ........................................... 21

            1.    The Estate's Petition and Motion to Dismiss ............... 21

            2.    The Arbitration Panel Issues Further Awards, Prompting a Second Petition ...................... 23

            3.    Judge Xinis Agrees with Ms. Yu's Position on Interest and Enters a Consolidated Final Judgment ................. 23

SUMMARY OF THE ARGUMENT ....................................................... 24

ARGUMENT ....................................................................................... 26

    I.    The New York Convention Authorizes
        Dismissal on Procedural Grounds ................................................... 26

        A.    Standard of Review ............................................................. 26

        B.    *Forum Non Conveniens* and Federal Rule of
                Civil Procedure 19 Are Procedural Defenses
                Available in Convention Cases ........................................... 26

                1.    The Convention's Plain Text Supports
                        the Availability of Procedural Defenses ..................... 26

                2.    The Executive Branch, Whose Views Are
                        Entitled to Great Weight, Endorses the
                        Availability of Procedural Defenses ........................... 27

                3.    The Overwhelming Weight of the Case Law
                        Supports the Availability of Procedural Defenses ........ 28

                4.    There Is Every Practical Reason to Make
                        Available Procedural Defenses to
                        Domestic Targets of Enforcement Petitions ............... 32

                5.    There Is No Circuit Split, But Affirming
                        Would Create One ...................................................... 34

                6.    The Availability of Procedural Defenses Does Not
                      Undermine the Pro-Enforcement
                      Thrust of the Convention .......................................... 35

         C.    Reversal on this Issue Warrants a Remand ........................... 36

    II.    The Amended Petition Should Have Been Dismissed or Stayed ...... 37

        A.    Standard of Review ............................................................. 37

        B.    The Court Should Dismiss or Stay Under *Forum Non
                Conveniens* ......................................................................... 38

1.     Standard for *Forum Non Conveniens*.......................... 38

2.     Hong Kong Is An Appropriate Forum ....................... 39

3.     The Private Factors Support Dismissal ...................... 40

4.     The Public Factors Support Dismissal ....................... 42

C.     The Court Should Dismiss for Failure to
Join Necessary Parties Under Rule 19 ................................. 44

1.     Standard Under Rule 19............................................. 44

2.     The Absent Parties Are "Required" ........................... 44

3.     Dismissal is the Appropriate Remedy........................ 46

III.     The District Court Should Refused Enforcement of Order 9
As Violating Public Policy................................................... 46

A.     Standard of Review............................................. 46

B.     Enforcement of Order 9 in the U.S. Would
Violate The Public Policy of International Comity............... 47

IV.     Any Disputed Factual Issues Require a Hearing............................. 52

V.     To the Extent this Court Affirms the Entry of Judgment,
the Judgment Should Be Modified to Be Denominated
in the Currency of the Award, With a Directive
that RMB Payments May be Made in China.................................. 53

A.     Standard of Review............................................. 53

B.     Any Judgment Should Mirror the Currency
in Which the Parties Chose to Deal and
in Which the Award Was Denominated................................ 53

CONCLUSION ........................................................................ 56

STATEMENT REGARDING ORAL ARGUMENT ......................................... 56

iii

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**Cases**

*Abbott v. Abbott*,
   560 U.S. 1 (2010) ............................................................................ 27

*Alexander v. Industries of the Blind, Inc.*,
   901 F.2d 40 (4th Cir. 1990) ............................................................ 52

*American Dredging Co. v. Miller*,
   510 U.S. 443 (1994) ........................................................................ 27

*Bangura v. Hansen*,
   434 F.3d 487 (6th Cir. 2006) .......................................................... 38

*Base Metal Trading, Ltd. v. OJSC "Novokuznetsky Aluminum Factory,"*
   283 F.3d 208 (4th Cir. 2002) .................................................... 29, 30

*Bry-Man's, Inc. v. Stute*,
   312 F.2d 585 (5th Cir. 1963) .......................................................... 46

*CBF Indústria de Gusa S/A v. AMCI Holdings, Inc.*,
   850 F.3d 58 (2d Cir. 2017) ............................................................. 26

*Central States, Southeast & Southwest Areas Health
   and Welfare Fund v. First Agency, Inc.*,
   756 F.3d 954 (6th Cir. 2014) .......................................................... 30

*Compania Naviera Joanna SA v. Koninklijke Boskalis Westminster NV*,
   569 F.3d 189 (4th Cir. 2009) .......................................................... 39

*Continental Transfert Technique Ltd. v. Federal Government of Nigeria*,
   603 F. App'x 1 (D.C. Cir. 2015) ..................................................... 55

*Crescendo Maritime Co. v. Bank of Communications Co. Ltd.*,
   15 Civ. 4481, 2016 WL 750351 (S.D.N.Y. Feb. 22, 2016) ...... 35, 36

*D.H. Blair & Co., Inc. v. Gottdiener*,
   462 F.3d 95 (2d Cir. 2006) ............................................................. 47

iv

*Dmarcian, Inc. v. Dmarcian Europe BV*,
    60 F.4th 119 (4th Cir. 2023) .................................................................. 37, 48

*EEOC v. American & Efird Mills, Inc.*,
    964 F.2d 300 (4th Cir. 1992) ......................................................................... 36

*Evans v. Technologies Applications & Service Co.*,
    80 F.3d 954 (4th Cir. 1996) ........................................................................... 47

*Figueiredo Ferraz E Engenharia de Projeto Ltda. v. Republic of Peru*,
    665 F.3d 384 (2d Cir. 2011) .......................................................................... 43

*Frontera Resources Azerbaijan Corp. v. State Oil Co. of Azerbaijan Republic*,
    582 F.3d 393 (2d Cir. 2009) .......................................................................... 30

*GE Energy Power Conversion France SAS, Corp. v. Outokumpu
    Stainless USA, LLC*,
    140 S.Ct. 1637 (2020) ............................................................................. 28, 29

*Gunvor SA v. Kayablian*,
    948 F.3d 214 (4th Cir. 2020) ......................................................................... 37

*Hendricks v. Bank of America, N.A.*,
    408 F.3d 1127 (9th Cir. 2005) ....................................................................... 30

*Hewlett-Packard Co., Inc. v. Berg*,
    61 F.3d 101 (1st Cir. 1995) ..................................................................... 31, 38

*In re Arbitration between Monegasque De Reassurances S.A.M. v.
    Nak Naftogaz of Ukraine*,
    311 F.3d 488 (2d Cir. 2002) .......................................................................... 28

*Industrial Risk Insurers v. M.A.N. Gutehoffnungshïtte GnbH*,
    141 F.3d 1434 (11th Cir. 1998) ..................................................................... 46

*Intervest International Equities Corp. v. Aberlich*,
    12 Civ. 13750, 2013 WL 1316997 (E.D. Mich. March 29, 2013) ................... 32

*Jiali Tang v. Synutra International Inc.*,
    656 F.3d 242 (4th Cir. 2011) ..................................................................... 38, 40

*Jones v. Caddo Parish School Board*,
    735 F.2d 923 (5th Cir. 1984) ........................................................................ 38

*Leidos, Inc. v. Hellenic Republic*,
    881 F.3d 213 (D.C. Cir 2018) ..................................................................... 54

*LGC Holdings, Inc. v. Julius Klein Diamonds, LLC*,
    238 F. Supp. 3d 452 (S.D.N.Y. 2017) ........................................................ 47

*Matter of Oil Spill by Amoco Cadiz Off Coast of France on March 16, 1978*,
    954 F.2d 1279 (7th Cir. 1992) ............................................................ 53, 54

*Medellin v. Texas*,
    552 U.S. 491 (2008) .................................................................................... 26

*Mitsui & Co., Ltd. v. Oceantrawl Corp.*,
    906 F. Supp. 202 (S.D.N.Y. 1995) ............................................................ 54

*Newport News Shipbuilding & Dry Dock Co. v. Riley*,
    262 F.3d 227 (4th Cir. 2001) ..................................................................... 26

*Orange Middle E. & Africa v. Republic of Equatorial Guinea*,
    15 Civ. 849, 2016 WL 2894857 (D.D.C. May 18, 2016) ............................. 32

*Peer v. Lewis*,
    606 F.3d 1306 (11th Cir. 2010) ................................................................. 37

*Q International Courier Inc. v. Smoak*,
    441 F.3d 214 (4th Cir. 2006) ..................................................................... 36

*Roe v. Doe*,
    28 F.3d 404 (4th Cir. 1994) ....................................................................... 47

*Rose v. Simms*,
    95 Civ. 1466, 1995 WL 702307, at *3 (S.D.N.Y. Nov. 29, 1995) .................... 45

*Sea-Roy Corp. v. Parts R Parts, Inc.*,
    Nos. 98-1028, 98-1546, 1999 WL 111281 (4th Cir. Mar. 4, 1999) ................. 53

*Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co. v. Navimpex Centrala Navala,*
   989 F.2d 572 (2d Cir. 1993) ...................................................... 29

*Silkworm Screen Printers, Inc. v. Abrams,*
   978 F.2d 1256 (4th Cir. 1992) ................................................... 52

*Societe Nationale Industrielle Aerospatiale v. U.S. District Court,*
   482 U.S. 522 (1987) .................................................................. 48

*TermoRio S.A. E.S.P. v. Electranta S.P.,*
   487 F.3d 928 (D.C. Cir. 2007) .................................................. 48

*Termorio S.A. E.S.P. v. Electrificadora Del Atlantico S.A. E.S.P.,*
   421 F. Supp. 2d 87 (D.D.C. 2006) ............................................ 32

*TMR Energy Ltd. v. State Property Fund of Ukraine,*
   411 F.3d 296 (D.C. Cir. 2005) .................................................. 34

*Venture Global Engineering, LLC v. Satyam Computer Services, Ltd.,*
   233 F. App'x, 517 (6th Cir. 2007) ............................................ 49

*Victrix S.S. Co., S.A. v. Salen Dry Cargo A.B.,*
   825 F.2d 709 (2d Cir. 1987) ...................................................... 49

*W.R. Grace and Co. v. Local Union, 759,*
   461 U.S. 757 (1983) .................................................................. 47

*Xiamen Xinjingdi Group Co Ltd v. Eton Properties Ltd,*
   [2020] HKEC 3165, 2020 WL 4206950 ............................... 18, 19

*Xu Hongbiao v. Oasis Investment Group Ltd.,*
   [2023] HKEC 1202, 2023 WL 11576 .................................. *passim*

## Statutes

28 U.S.C. § 1291 ........................................................................... 5

28 U.S.C. § 1331 ............................................................................ 5

9 U.S.C. § 207 .............................................................................. 29

vii

9 U.S.C. § 208 ................................................................ 52

9 U.S.C. § 6 .................................................................... 52

## Rules

Fed. R. Civ. P. 19 ............................................... 27, 44, 46

## Treatises

14D Charles Alan Wright, et al.,
    Federal Practice and Procedure § 3828 (4th ed. 2013) .................................... 39

4 James Wm. Moore, Moore's Federal Practice § 19.09 (2022) ......................... 27

4 James Wm. Moore, Moore's Federal Practice § 19.06 (2018) ......................... 46

7 Charles Alan Wright, et al.,
    Federal Practice & Procedure § 1613 (3d ed. 2023) ........................................ 45

Restatement (Third) of Foreign Relations Law § 823 (1987) ............................ 55

Restatement (Third) U.S. Law of International Commercial Arbitration,
    Tentative Draft No. 5 (2017) .................................................. 30

## Other Authorities

Aristides Diaz-Pedrosa, *Shaffer's Footnote 36*,
    109 W. Va. L. Rev. 17 (2006) ...................................................... 30

Brief for the United States as *Amicus Curiae*
    in Support of Vacatur and Remand*,*
    *Figueiredo Ferraz E Engenharia de Projeto Ltda. v. Republic of Peru*,
    No. 09-3925 (2d Cir. Feb. 15, 2011) ............................................. 28

Convention on the Recognition and Enforcement of Foreign Arbitral Awards,
    June 10, 1958, 21 U.S.T. 2517, 33 U.N.T.S. 38 ......................................*passim*

Gary B. Born,
    International Commercial Arbitration (3d ed. 2021) ....................................... 49

New York Convention, art. V(II)(b) ....................................................47

## INTRODUCTION

The primary issue raised by this appeal is whether respondents in arbitral enforcement proceedings under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958, 21 U.S.T. 2517, 33 U.N.T.S. 38 (the "New York Convention") can raise procedural defenses—in this case, *forum non conveniens* and the failure to join necessary parties, *see* Fed. R. Civ. P. 19—that would be available to any other type of litigant. The District Court erroneously concluded that they cannot, holding that a confirmation petition may be dismissed *only* based on one of the New York Convention's enumerated defenses to enforcement. The District Court's interpretation conflicts not only with the Convention's text, but also with the views of the Executive Branch and the Second Circuit. No appellate court has adopted the District Court's position, which, if affirmed, would create a circuit split.

This Court should reverse and remand with instructions that the District Court consider these procedural defenses, or, alternatively, should reverse and render judgment based on one or both defenses. The award at issue here largely consists of specific performance obligations to be carried out abroad and that are the subject of ongoing litigation in Hong Kong. There is every practical reason that the award should not be implemented in the United States (the *forum non*

*conveniens* defense), and all the more so because only a small subset of the relevant parties have been joined in these proceedings (the Rule 19 defense).

The dispute traces back to a 2010 contract among a group of Chinese investors and their affiliated entities. The contract set forth the complex procedures by which the investors would separate their interests in real estate companies in China and Hong Kong. Various disputes arose in implementing the contract, which led to a Hong Kong arbitration in 2013, and an award in 2018 (with various supplemental awards through 2020). The claimants in the arbitration were (i) now-deceased Chinese businessman Ke Zhengguang, whose estate (the "Estate") brought the District Court action, and (ii) Xu Hongbiao, a Chinese citizen, who is not a party to the District Court action and with whom the Estate is still at odds on how the award should be implemented. The respondents in the arbitration were Stephany Yu, the appellant here, as well as three parties that are not parties to the District Court proceedings: Ms. Yu's two sisters and Oasis Investment Group Limited ("Oasis").

Despite the award, challenges have remained. Today, there is litigation in Hong Kong (the seat of arbitration) to compel the claimants in the arbitration to cooperate in performance of the award. Recently, the Hong Kong court dismissed an application by the Estate to dismiss that proceeding, and has begun to sort through the disputes on their merits. Among the complex factual disputes being

2

litigated are: how to structure the transfer to the arbitral claimants of a real estate holding company affiliated with Oasis; how to subdivide and transfer a series of commercial properties; and the process for seeking regulatory approval in China for various aspects of the award.

All these matters—including the events, the real estate companies, and the underlying contract—are centered in China and Hong Kong, and have virtually no connection to the United States. The District Court proceeding was filed here for transparently improper tactical purposes, including to skirt Chinese currency control laws. The only connection to the United States is Ms. Yu, who moved to Maryland during the arbitration. It is apparent that proceedings were brought against her (and only her) in the U.S. as a pressure tactic, not because the Maryland court has any feasible means of addressing the complex issues before it or of undertaking the ongoing supervision that implementing the award will require.

Unlike many other arbitral awards, which simply direct one party to pay money to another and for which enforcement is appropriate wherever the debtor's assets can be found, the award here contains directives that consist primarily of specific performance obligations (7 out of 9 of the "Orders"). The Orders are to be carried out in China and Hong Kong, which makes enforcement here infeasible. In addition, requiring Ms. Yu to pay the monetary damages portion of the award

(referred to as Order 9) in the United States instead of in China would risk violating China's currency control laws.

To be clear, Ms. Yu is not seeking to avoid paying Order 9—she already paid half in China and has posted a bond for the remainder in connection with the appeal before this Court—but believes that the Estate should not be permitted to gain an unfair advantage and expose her to legal risk in China by enforcing the award here, especially while the issues surrounding implementation of the award are being litigated abroad. These are among the reasons why the District Court should have stayed its hand.

The District Court chose instead to grant the Petition. In doing so, its threshold error—and a key ground for this appeal—was the conclusion that procedural defenses are categorically unavailable under the New York Convention. This conclusion was incorrect, because the Convention states that awards are to be enforced "**in accordance with the rules of procedure** of the territory where the award is relied upon." *See* New York Convention, art. III. (emphasis added).

The Second Circuit and the Executive Branch (which is owed deference on treaty interpretation) have correctly interpreted this language as written: to allow for procedural defenses in Convention cases. Although there is no Fourth Circuit decision squarely on point, closely analogous Fourth Circuit case law supports Ms. Yu's position.

In the event the Court agrees that Ms. Yu's procedural defenses *are* available, then we respectfully urge the Court to remand so that the District Court may consider Ms. Yu's defenses in the first instance, and with the benefit of ongoing developments in Hong Kong.

The District Court's other primary error was to enforce Order 9, notwithstanding the risk that Ms. Yu would be violating Chinese law by paying the damages outside of China. The Convention allows for enforcement to be denied to the extent there is a sound "public policy" basis, and showing respect for another country's laws—international comity—is exactly the sort of policy ground to decline enforcement. Neither this Court nor the District Court should lend a hand to international lawbreaking.

For these and other reasons discussed below, the District Court's judgment should be reversed.

## JURISDICTIONAL STATEMENT

The District Court had subject matter jurisdiction under 28 U.S.C. § 1331 because the case arises under one of the "treaties of the United States," 28 U.S.C. § 1331, namely, the New York Convention.

This Court has appellate jurisdiction under 28 U.S.C. § 1291 because the appeal is from the District Court's "final decision[]," 28 U.S.C. § 1291, namely the

5

Consolidated Final Judgment (JA2161-2162), which disposed of all the parties' claims.

This appeal is timely, because the Notice of Appeal was filed on February 6, 2023 (JA2163-2164), which is fewer than 30 days after the Consolidated Final Judgment was entered on January 9, 2023. (JA2161-162.)

## ISSUES PRESENTED FOR REVIEW

1.  Whether the New York Convention categorically bars consideration of procedural defenses that are not specifically enumerated in the Convention. The District Court erroneously concluded that unenumerated procedural defenses could not be considered.

2.  Whether this case should be dismissed or stayed under *forum non conveniens* or Rule 19 non-joinder. The District Court erroneously concluded that these doctrines were categorically unavailable in Convention cases, and so did not analyze their merits.

3.  Whether the District Court should have declined to enforce the Award's "Order 9" concerning damages, because enforcement would place Ms. Yu in violation of Chinese law and at risk of severe legal peril under China's currency control laws, thereby implicating the

Convention's "public policy" exception. The District Court erroneously ruled that Order 9 should be enforced.

4. Whether, to the extent the District Court resolved factual disputes against Ms. Yu, it should have held an evidentiary hearing. The District Court erroneously decided disputed factual issues against Ms. Yu, without a hearing, and seemingly without acknowledging the evidence Ms. Yu had supplied.

5. Whether any judgment should have been entered in the currencies in which the Award was denominated, with a direction that payments in Chinese currency (renminbi, or RMB) should be made in China. The District Court erroneously entered judgment in U.S. Dollars.

## STATEMENT OF THE CASE

### A.    The Parties

In the early 2000s, Mr. Ke, Mr. Xu, Ms. Yu, and Ms. Yu's two sisters formed Oasis to purchase and develop real estate in China. (JA433 ¶ 8.)[1]  Ms. Yu is a Chinese native who, until moving with her family to Maryland in 2016, had

---

[1] While the arbitral award uses the concept of an "estate" to carry forward Mr. Ke's interests, unlike U.S. law, Chinese law does not recognize estates as separate legal entities. (JA1300 ¶ 8; JA1205 ¶ 8.) Ms. Yu refers to the "Estate" in this proceeding solely to conform with the nomenclature of the award.

lived most of her life in China. (*Id*. ¶ 7.) She maintains a residence in China, holds substantial assets in China and Hong Kong, and frequently returns there for business. (*Id*.)

## B.  The 2010 Agreement

In April 2010, the Oasis partners and certain affiliated entities entered into an agreement (the "2010 Agreement") that set forth an intricate plan for the partners to separate their interests. (JA433 ¶ 10; JA32-40.) The 2010 Agreement was written in Chinese, and the listed address for each party is in China. (JA23-30; JA32.) Ms. Yu and her sisters are referred to in the 2010 Agreement as the "Controlling Shareholders" and the other owners (Messrs. Xu and Ke) are referred to as the "Non-Controlling Shareholders." (JA33.)

The 2010 Agreement included detailed provisions concerning how the parties' interests were to be divided. The three basic elements (cash payments, stock transactions, and property transactions) are summarized below.

**Cash Payments**. Oasis was to pay Messrs. Ke and Xu RMB 100 million up front, followed by a final payment of RMB 150 million when the various steps (discussed below) were completed. (JA33-38, Arts. 1-2.) The total cash consideration of RMB 250 million is the equivalent of $36.6 million at current exchange rates.

8

**SJHC Transfer**. SJHC, an indirect subsidiary of Oasis, owns a large property development in China and is worth at least $100 million. (JA434 ¶ 13; JA445 ¶ 47.) SJHC is a special type of Chinese joint venture between domestic and offshore shareholders, and, under Chinese law, the government must approve any transfer of its share capital. (JA540 ¶ 3.)

As part of their redemption consideration, Messrs. Xu and Ke were to receive full ownership of SJHC through a multi-step procedure. (JA434 ¶ 13; JA1664 ¶ 19.) In simplified terms, SJHC was to be first transferred internally within the Oasis-affiliated companies for a three-year "entrustment period," during which time Messrs. Xu and Ke would control its newly formed holding company, and after which that holding company would be transferred outright. (JA36 § 2.3.2; JA1662-1664 ¶¶ 17-18.) The multi-step process was driven by tax considerations. (JA1664 ¶ 19.) Under Chinese law, an equity transfer between affiliates can be treated as a tax-free "reorganization" if certain conditions are met, including that the transferred equity be held for three years after the reorganization—hence the parties' use of an "entrustment period." (*Id*.) This tax-free aspect of the deal was essential to making the economics worthwhile for Ms. Yu. (*Id*.)

**Property Exchange**. A different subsidiary of Oasis was to sign an agreement transferring approximately 8,000 square meters of commercial space in Shanghai (the "Jiuting Shops") to the Non-Controlling Shareholders. (JA38 § 3.1)

9

In exchange, one of the Non-Controlling Shareholders' companies' was to sign an agreement transferring to Oasis and the Controlling Shareholders two "Villas," each of approximately 1,200 square meters, also located in Shanghai and owned by SJHC. (*Id*. § 3.2.)

### C.      The Arbitration in Hong Kong

Various disputes arose in the parties' initial attempts to implement the 2010 Agreement, and, in February 2013, the Non-Controlling Shareholders filed an arbitration claim in Hong Kong against Oasis and against the Controlling Shareholders. (JA107-206 (the "Award"); JA112 ¶ 13.)

In December 2013, while the arbitration was ongoing, Mr. Ke died. (JA115 ¶ 32).) In April 2016, the arbitration Panel authorized the wife and daughter of Mr. Ke to participate in the arbitration as administrators of his estate. (JA130 ¶ 100.)

On February 28, 2018, the Panel issued the Award, with nine enumerated orders, briefly summarized as follows. (JA940-942 (full text of Orders, in English).)

First, Orders 1-2, concern the property exchange, and direct various parties to carry out those provisions, as set forth in the 2010 Agreement. (JA940 ¶ 5.)

Second, Orders 3-7 concern the transfer of SJHC. Order 3 directs the settlement of intracompany debts. (JA941.) Order 4 directs the Non-Controlling Shareholders to "submit an audit report to the relevant approval authorities" for the transaction. (*Id*.) This report is necessary for initial tax review (irrespective of the

10

goal of a tax-free reorganization) and to obtain the necessary regulatory approval. (JA437-438 ¶ 20.) Orders 5-7 specify what entities must engage in what transactions to complete the formal transfer. (JA941.)

Third, Order 8 requires Oasis to make the final payment, subject to adjustments, but only when the prior conditions have been completed. (JA942.)

Finally, Order 9 sets forth certain damages for rent in China relating to the property exchange. Oasis and the Controlling Shareholders believed the Villas being offered to them were too small, in violation of the 2010 Agreement. (JA192 ¶ 288).) Thus, instead of formally transferring the Jiuting Shops, they allowed the Non-Controlling Shareholders to use most of the commercial space (approximately 6,000 of the 8,000 square meters) via an "authorization letter." (JA192-193 ¶¶ 294-95).) The Panel concluded that the Controlling Shareholders were liable to the Non-Controlling Shareholders for the rental value of the 2,000 square-meter shortfall, and calculated damages in RMB by reference to comparable Chinese rental transactions. (JA194-197 ¶¶ 296-303.)

## D. The Claimants' Infighting and Non-Cooperation Impedes Carrying Out the Award

Ms. Yu was disappointed in the award, but her goal was to respect its terms and put this saga behind her. (JA438-439 ¶ 23.) Unfortunately, the Non-Controlling Shareholders had other plans. The Estate somehow gained control of the SJHC board after Mr. Ke's death, and Mr. Xu was intent on wresting it back

11

(JA439 ¶ 24; JA541-551 ¶¶ 5-13.) The Estate, on the other hand, was intent on enlarging the award by avoiding any enforcement in China and by improperly seeking to transfer the tax liabilities onto the Controlling Shareholders. The upshot is that nearly every aspect of implementing the Award has been impeded by the Estate and/or Mr. Xu.

**The SJHC Transaction**. Oasis ceded control of SJHC to the Non-Controlling Shareholders even before the 2010 Agreement. (JA439 ¶ 24; JA542 ¶ 7.) However, the formal the transfer of SJHC has been beset for years with impediments arising from disputes between Mr. Ke's heirs and Mr. Xu as to exactly how the transfer is to be accomplished. (JA439 ¶ 24; *see* JA541-551 ¶¶ 5-13 (more detailed summary).) The disagreements include various disputes on how the application process for regulatory approval is to move forward. (JA545-551 ¶¶ 10-13; *see also* JA1945-1949.)

**The Property Exchange**. The claimants' infighting has impeded the property exchange, too. (JA440 ¶ 27; *see* JA551-554 ¶¶ 14-16 (more detailed summary).) Chinese law limits what types of people or entities can own property (and how so), and, in sum, the claimants instructions to date either been conflicting and/or noncompliant with Chinese law. (JA551-552 ¶ 15; JA1274-1275 ¶ 4.) The roadblocks have been particularly unfair to Oasis and to Ms. Yu, since the claimants have had near complete control over the Jiuting Shops for years, while

12

Oasis has never received the Villas it was supposed to get in return. (*Id.*; *see also* JA1941-1943 ¶¶ 42-47.)

**Damages (Order 9).** Order 9, concerning damages, has likewise been obstructed by the Estate. In 2018, an Oasis subsidiary paid half of Order 9 payment to a bank account designated by Mr. Xu in China (JA440-441 ¶¶ 29-30.) But payment to the Estate had been impeded by the Estate's insistence that it be made in a non-RMB currency outside of Mainland China. (JA440-444 ¶¶ 28-44.) The Controlling Shareholders have repeatedly made clear that they are prepared to complete the payment, so long as the Estate will specify a bank account in China to receive the funds. (*Id.*; JA622; JA655; JA687-688; JA891.) The Estate has refused. (JA441-442 ¶¶ 31-38.)

### E.    Chinese Currency Regulation

As the Estate's administrators are well aware, overseas payments of RMB must be approved by Chinese regulators before RMB may flow out of China. (JA974-976 ¶¶ 8-11.) Ms. Yu's motion papers before the District Court included two expert declarations quoting (and attaching) the relevant authorities as to China's currency control laws. (JA971-1156; JA1295-1539.)

Most relevant here, Chinese law prohibits making or receiving payments in foreign currency "where such funds should be collected or paid in Renminbi." (JA977 ¶ 13; JA1073.) China's State Administration of Foreign Exchange (SAFE)

enforces its currency regulations and can impose severe fines on violators. (JA977-978 ¶ 15.) Among SAFE's regulations is the broad prohibition on "evading . . . the State's control over foreign exchange" by various specified means or "by **any other means**." (JA979 ¶ 18 JA1134 (emphasis added).) Under this broad authority, SAFE has repeatedly fined Chinese firms that have attempted, via a wide range of creative means, to do just that. (JA1079-1090) Violating currency control rules is also a crime that can result in imprisonment. (JA978-979 ¶¶ 16-18.)

Here, the obligation the Estate seeks to enforce in Order 9 triggers Chinese law insofar as it is an obligation that "should be collected or paid in Renminbi." (JA977 ¶ 13; JA1073.) The obligation concerns damages under a contract executed in China for rental payments associated with commercial property located in China. (JA979-980 ¶¶ 20-21.) If Order 9 had been paid in accordance with the underlying damage to which it pertained (*i.e.*, if Mr. Ke were paid rent in China pursuant to a commercial lease of a portion of the Jiuting shops), the Estate would need approval from regulators, and would need to pay Chinese taxes, before converting the funds into another currency and moving them abroad. (JA980 ¶ 21.) The risk for Ms. Yu is that Chinese regulators will consider a judgment payment made in the United States to be a scheme to evade those controls altogether, and to effectively move money abroad with no Chinese regulatory oversight.

### F.    The Estate Can Receive Payment in China

The Estate's primary rejoinder before the District Court was to claim that it would be impossible to receive the payment in China. (JA1194 ¶¶ 16-17; JA1205 ¶ 8.) The Estate is not a separate legal entity (*id*.), and so the only question is whether the Estate's administrators (Mr. Ke's wife and daughter) can accept funds in China. There cannot be a serious question that they can. For example:

- They held themselves out as Chinese citizens in 2014 for purposes of the arbitration (complete with supporting documentation), and have not taken the steps necessary to cease being Chinese citizens. (JA444 ¶ 46; JA480-481; JA485; JA1301-1303 ¶¶ 10-16.)

- They effectively control the day-to-day business of SJHC, a large Chinese real estate business worth at least $100 million. (JA445 ¶ 47.)

- They have designated a Chinese company owned by Mr. Ke's wife to receive the Jiuting Shops. (JA445 ¶ 48; JA522-529.)

- They have engaged counsel based in Shanghai, China. (JA443-444 ¶ 43.)

15

Given above, it is simply inconceivable that that the Estate's administrators lack a bank account in China or other means to accept funds there. Notably, when prior to the District Court litigation the Estate was refusing to accept payment in RMB in China, it never claimed that it would be impossible to do so. Its demands simply stated that it could demand payment wherever it wanted. (JA637; JA682.) If payment to a Chinese bank account were impossible all along, the Estate surely would have said so.

The Estate was also not candid with the District Court about this issue. One of its administrators filed a sworn declaration with the District Court claiming that the Estate could accept funds "only in Hong Kong" via "the Estate's HK bank account" (JA1194 ¶ 16), but the Estate's own actions later confirmed that this testimony was false. When the arbitral panel subsequently issued an award of costs and fees, the Estate—contrary to its prior sworn testimony—demanded payment to a particular bank account in the name of the *individual administrators* (*not* the Estate) (JA1609-1610)—the same individuals who, as discussed, have extensive business dealings in China.

### G. Ms. Yu Files Suit in China to Advance the SJHC Transaction, Only to Face More Obstruction

In April 2019, at Ms. Yu's direction, an Oasis affiliate filed a lawsuit in China against SJHC (controlled at all times by the Estate) to force SJHC to comply with a shareholder directive to move forward with the initial reorganizational steps

16

of the SJHC transfer. (JA1670 ¶ 36; JA1260-1262; JA1267-1268.) Mr. Xu

supported the suit. (JA1670 ¶ 36.) But the Estate, controlling SJHC, again

obstructed.

The Estate argued that the internal reorganization was supposed to be done

in a novel way that it had neglected to mention in over a decade of disputes—one

that would conveniently undo tax-free treatment and, instead, shift tax burdens to

Oasis and to Ms. Yu. (JA1670-1671 ¶¶ 37-38.)  This position was and is frivolous,

and, as the Hong Kong Court recently recognized (discussed below), cannot be

squared with how Mr. Ke and the Estate conducted the arbitration for over seven

years. (JA1670-1671 ¶¶ 39-42.)[2] Moreover, the Estate has never been able to

explain why the parties would carefully use the "entrustment period" structure if

not to invoke the tax treatment that the Estate wants to now jettison, improperly

shifting costs to Ms. Yu.

The Shanghai court ultimately issued a ruling that the parties "should

negotiate on the tax burden under the circumstance that the special tax treatment

---

[2] In simplified terms, the Estate argued that a particular subsidiary, referred to as
"Shibang" should be re-incorporated as a direct subsidiary of Oasis, as opposed to
remaining as an indirect subsidiary, with an intermediate holding company referred
to as "Greencourt Properties" in between. (JA1670 ¶ 37.) There can be no dispute
that this change would inexplicably undo the special tax treatment that was the
evident purpose for the contemplated structure. (JA1670-1671 ¶ 38.) Beyond that,
both the 2010 Agreement and the Award direct the entrustment agreement to be
*signed by Greencourt Properties*, which of course *presumes*, contrary to the
Estate's position, that Greencourt Properties is the parent company of Shibang.
(JA1671 ¶¶ 40, 42; JA204 (Order 6); JA36 § 2.3.2.)

17

may be applied"—*i.e.* that the equity transfer be treated as a tax-free "reorganization" under Chinese law —"in order to reach a new agreement." (JA1757.) There is, bluntly put, no prospect for a new agreement that would generate new obligations for Ms. Yu in violation of the award and 2010 Agreement.

### H.    Ms. Yu Files Claims in Hong Kong to Implement the Award

In November 2020, Mr. Xu filed suit against Ms. Yu, her sisters, and Oasis in Hong Kong to enforce the Award. *See Xu Hongbiao v. Oasis Inves. Grp. Ltd.*, [2023] HKEC 1202, 2023 WL 11576, ¶ 28 (CFI Mar. 29, 2023). In April 2021, Ms. Yu and her co-defendants filed counterclaims not only against Mr. Xu, but sought to add the Estate's administrators, as well (they are now parties to the case). (JA1922-1965.). By this point, the corporate lawsuit in Shanghai was not even able to advance the first step of the SJHC transaction, and so it was clear that implementing the 2010 Agreement would need comprehensive oversight.

The Hong Kong case is what is known as a "common law action on the award," where the court, instead of being bound to merely issue an "order which mirrors and does not go beyond the award," has "remedial flexibility." *Xiamen Xinjingdi Grp. Co. v. Eton Properties Ltd.*, [2020] HKEC 3165, 2020 WL 4206950 ¶¶ 81, 123 (CFI Oct. 9, 2020). The theory is that the contracting parties "impliedly promise to perform a valid award," and so the court should be empowered in the

face of a breach of that promise to "fashion an apt remedy chosen from the full range of remedies available in an ordinary common law action"—including awarding "damages for failure to perform the award," or issuing a declaration as to the award's "construction and effect." *Id.* ¶ 122.

To that end, the court in Hong Kong is being asked to implement the specific steps advocated by Ms. Yu for the property and stock transactions to move forward, and, failing cooperation by the Estate or by Mr. Xu, to authorize the Jiuting Shops and/or SJHC to be sold, with the proceeds distributed, net of any damages or other offsets. (JA1959-1964.)

## I.    The Hong Kong Court Rejects the Estate's Efforts to Avoid Moving Forward

The Estate has repeatedly tried and failed to resist the Hong Kong proceedings, even though Hong Kong was the seat of the arbitration.

First, the Estate's administrators refused service of process in Hong Kong, forcing the court to authorize service upon them elsewhere. (JA2069-2070; JA2101-2102.) Meanwhile, Mr. Xu appeared and answered Ms. Yu's claims (JA2073-2090.) Thus, *all* stakeholders are now before the Hong Kong court.

Second, once properly joined, the Estate's administrators filed the equivalent of a motion to dismiss the counterclaims. On March 29, 2023, the Hong Kong court not only denied the motion, but awarded Ms. Yu her costs and fees associated with the baseless motion. *See Hongbiao*, 2023 WL 11576 ¶¶ 88-89.

19

The court rejected the Estate's suggestion that the matter could be resolved summarily on the papers in its favor: "[t]the 4.28 Agreement involves a complex divestment scheme. There are clearly substantial disputes between the parties in the performance and enforcement of the Awards. This Court ought not embark upon a mini-trial on affirmations in any attempt to resolve them by way of summary determination." *Id.* ¶ 55.

Further, the court flatly rejected the Estate's suggestion that enforcement ought to occur in before the U.S. District Court. The court observed that "United States federal courts have only secondary jurisdiction over a foreign award, so that they may not vacate, set aside, or modify the award, but are limited to deciding whether the award may be enforced." *Id.* ¶ 59(c).

Relatedly, the court noted that an enforcement proceeding in a secondary jurisdiction does not provide the same flexibility as a common law action on the award: "[i]ssues raised in the Counterclaim on the alleged breaches of the Implied Promise were not before the Maryland Court; nor was 'the full range of remedies available in an ordinary common law action' available to it[.]'" *Id.* ¶ 59(f).

And, speaking directly to issues raised by this appeal, the Hong Kong court emphasized the challenges of enforcement in Maryland: "[n]ot all parties to the Awards are before the Maryland Court, which will render any further attempts to require compliance problematic[.]" *Id.* ¶ 59(g); *see also id.* ¶ 77 (stating that the

20

U.S. court in Maryland "lacks jurisdiction over the other parties to the Awards," which means that there are "significant limitations," *id*., in what it can accomplish).

The Estate argued that the Shanghai proceedings were preclusive as to one of the main issues in dispute—the proper means to reorganize SJHC before its transfer (*see* footnote 2, *supra*)—but the court rejected that argument as well. In fact, the court found that there was "clear force" to Ms. Yu's argument "that it was the parties and the Tribunal's understanding" that the reorganization was to be done in the tax-free way she has been advocating all along. *Id*. ¶ 66.

### J.    Procedural History

#### 1.    The Estate's Petition and Motion to Dismiss

On November 16, 2018, the Estate filed its initial petition with the District Court to enforce the Award, focusing only on the obligation in Order 9, for Ms. Yu to pay damages. (JA14 ¶ 2.)

In March 2019, the Estate filed an Amended Petition that sought to confirm the Award in its entirety (not just Order 9). (JA357-366.)

In April 2019, Ms. Yu moved to dismiss the Amended Petition on the grounds now raised in this appeal (among others). (JA389-430.)

In February 2020, the trial court (Hon. Paul W. Grimm) denied Ms. Yu's motion to dismiss. (JA1565-1584.)

Judge Grimm rejected Ms. Yu's procedural defenses solely because he concluded that they were categorically unavailable in proceedings under the New York Convention: "The bottom line is that the New York Convention lists seven exclusive defenses to enforcement, and neither *forum non conveniens* nor failure to join necessary parties under Rule 19 is one of them." (JA1576; *see also* JA1584 (stating that Ms. Yu's public policy defense was the "only one" available under the Convention).

Judge Grimm next rejected Ms. Yu's public policy defense, which *is* one of the defenses to enforcement stated in the Convention, because he asserted—erroneously—that Ms. Yu had marshaled no evidence for her concerns about Chinese currency control laws. (JA1578.) The opinion did not suggest that Judge Grimm disagreed with Ms. Yu's evidence in any way; instead he appeared to simply overlook that the evidence existed in the first place.

Judge Grimm then stated that enforcement in the United States was of no concern to China or to its currency control laws because "[t]his Court is not being asked to enforce a judgment in China." (*Id.*)

The opinion appeared to take as a given the Estate's assertions that it could be paid wherever it wanted: "Stephany Yu did not provide a payment that could be accepted by the Estate's Hong Kong bank account as requested." (JA1583.) The decision did not discuss whether the Estate could have accepted RMB in China.

Finally, Judge Grimm ruled that judgment would be entered in U.S. Dollars (not RMB), because, he concluded, doing so was the "norm" and because judgment should only be entered in a foreign currency when requested by the arbitral creditor. (JA1580-1581.)

### 2. The Arbitration Panel Issues Further Awards, Prompting a Second Petition

Before Judge Grimm's decision could be reduced to a judgment, the arbitral panel issued two further awards relating to costs and interest, and, in August 2020, the Estate filed a second action in the District Court to enforce those supplemental awards. (JA210-346.)

In October 2020, the parties entered into stipulation (later "so-ordered") consolidating the two cases, and deeming the arguments made with respect to the first case preserved for purposes of the second. (JA1624-1628.)

The parties had been unable to agree on the form of a single consolidated judgment, and so the stipulation set forth a briefing schedule for that final issue to be resolved. (JA1626 (first "Whereas" clause); JA1627 ¶¶ 4-6.)

### 3. Judge Xinis Agrees with Ms. Yu's Position on Interest and Enters a Consolidated Final Judgment

The disputes about the form of the consolidated judgment are not raised on this appeal. In brief summary, the primary dispute was whether (as the Estate argued) Ms. Yu would be subject to post-award interest on Order 8 (the payment

contingent on completing prior Orders) for an indefinite period until the Award was fully carried out, or whether (as Ms. Yu contended) the interest was limited to certain fixed periods. (JA1629-1918.) Ms. Yu emphasized that the Panel did not state, and could not have possibly intended, for her to bear the costs of all future delays—even delay caused by the intransigence of the Estate or Mr. Xu and especially in light of the complexity and history of disputes. (JA1645-1647.)

In January 2023, Judge Paula Xinis (who at this point had taken over the case from Judge Grimm) issued an opinion the resolved the interest issue in Ms. Yu's favor (JA2151-2160), and then entered a Consolidated Final Judgment. (JA2161-2162.)

This appeal followed. (JA2163-2164.)

## SUMMARY OF THE ARGUMENT

This Court should reverse the judgment because the District Court misinterpreted the New York Convention to prohibit consideration of procedural defenses, notwithstanding that the Convention's text authorizes the application of domestic procedural doctrines, and notwithstanding the great weight of authority against the District Court's view. Affirming would needlessly create a circuit split. Further, there is no practical reason why U.S. targets like Ms. Yu should be stripped of the procedural rights that any other litigant would have.

24

If this Court agrees that the District Court erred, the case should then be remanded for consideration of the procedural defenses in the first instance by the District Court. To the extent this Court were to delve into the merits of the procedural defenses (which it need not do), the Court should dismiss or stay this proceeding under either or both of *forum non conveniens* or Rule 19.

Alternatively, the Court should reverse confirmation of Order 9 (the money damages aspect of the award) because its enforcement would place Ms. Yu at severe legal peril and thereby violate public policy. The District Court mistakenly stated that Ms. Yu put forth no evidence on this issue when, in fact, she submitted two expert declarations with hundreds of pages of exhibits.

The District Court's decisions on the above issues appeared to rest on factual determinations against Ms. Yu (such as concluding that the Estate was incapable of being paid in China), and a further error was the District Court resolving these disputes without even affording Ms. Yu an evidentiary hearing.

Finally, if any judgment is to be entered, it should be denominated in the currencies in which the Panel took care to specify (RMB and Hong Kong Dollars), and should include a clear directive that RMB payments may be made in China. The District Court appeared to believe that a Convention petitioner has an absolute right to insist on a U.S. Dollar judgment, but there is neither case law support nor any good reason for such a rule.

25

# ARGUMENT

## I. The New York Convention Authorizes Dismissal on Procedural Grounds

### A. Standard of Review

The District Court's "legal interpretations of the New York Convention" are reviewed "*de novo.*" *CBF Indústria de Gusa S/A v. AMCI Holdings, Inc.*, 850 F.3d 58, 70 (2d Cir. 2017) (citation omitted); *see also Newport News Shipbuilding & Dry Dock Co. v. Riley*, 262 F.3d 227, 231 (4th Cir. 2001) (*de novo* review of legal questions).

### B. *Forum Non Conveniens* and Federal Rule of Civil Procedure 19 Are Procedural Defenses Available in Convention Cases

The District Court erred in reading the Convention to preclude all procedural defenses. The proper reading of the Convention, allowing for procedural defenses, is supported by the Convention's text, the views of the Executive Branch, case law, and practical considerations.

#### 1. The Convention's Plain Text Supports the Availability of Procedural Defenses

The "interpretation of a treaty, like the interpretation of a statute, begins with its text." *Medellín v. Tex.*, 552 U.S. 491, 506 (2008) (citation omitted). Here, the text of Article III of the Convention states that awards are to be enforced "**in accordance with the rules of procedure** of the territory where the award is relied upon." New York Convention, art. III (emphasis added). The only constraint is that

26

the enforcing court cannot impose "substantially more onerous conditions" than those that would apply to a enforcing a domestic award. *Id.*

*Forum non conveniens* and Rule 19 are indisputably rules of procedure. The Supreme Court has described *forum non conveniens* as a rule "of procedure rather than substance." *Am. Dredging Co. v. Miller*, 510 U.S. 443, 453 (1994) (citation omitted). Rule 19 addresses procedural matters. It sets forth the circumstances when individuals or entities must be joined in a case, and the circumstances when a case must be dismissed in their absence. Fed. R. Civ. P. 19. And it is among the Federal Rules of Civil Procedure. *See also* 4 James Wm. Moore, Moore's Federal Practice § 19.09 (2022) (explaining that Rule 19's "compulsory party joinder doctrine is a matter of procedure properly governed" by federal law, irrespective of contrary state law).

The District Court did not address at all the Convention's explicit reference to using the enforcing court's "rules of procedure."

### 2. The Executive Branch, Whose Views Are Entitled to Great Weight, Endorses the Availability of Procedural Defenses

The Executive Branch has endorsed the availability of procedural defenses in this context, and it "is well settled that the Executive Branch's interpretation of a treaty 'is entitled to great weight.'" *Abbott v. Abbott*, 560 U.S. 1, 15 (2010) (citation omitted). Specifically, in an amicus brief in 2011, the Department of Justice argued that *forum non conveniens* was "among the 'procedural laws' of

27

general applicability in the United States," and should therefore be available in defense to enforcement of a foreign arbitral award. *See* Brief for the United States as *Amicus Curiae* in Support of Vacatur and Remand, *Figueiredo Ferraz E Engenharia de Projeto Ltda. v. Republic of Peru*, No. 09-3925-cv(L), at 21-22 (2d Cir. Feb. 25, 2011). The Department cited with approval the Second Circuit case law, discussed below.

### 3. The Overwhelming Weight of the Case Law Supports the Availability of Procedural Defenses

In the case most squarely on point, the Second Circuit held, in dismissing a Convention case on *forum non conveniens* grounds: "[T]he drafters of the Convention, by allowing for the application of 'the rules of procedure where the award is relied upon,' Convention art. III, contemplated that different procedural rules would be applied in the courts of the various signatory nations." *In re Arbitration between Monegasque De Reassurances S.A.M. v. Nak Naftogaz of Ukraine*, 311 F.3d 488, 496 (2d Cir. 2002) (citation omitted).

The Supreme Court has not addressed the issue, but has acknowledged, in an analogous context, that domestic legal doctrines are not displaced by the Convention. In *GE Energy Power Conversion France SAS, Corp. v. Outokumpu Stainless USA, LLC*, 140 S. Ct. 1637 (2020), the Supreme Court held that state law equitable estoppel principles could bind a non-signatory to an agreement to arbitrate, notwithstanding that equitable estoppel is not contemplated by the

Convention. The Court held that the "Convention was drafted against the backdrop of domestic law," and therefore "it would be unnatural to read" the Convention "to displace domestic doctrines in the absence of exclusionary language." 140 S. Ct. at 1645. The defenses at issue here are likewise doctrines that are part of the "backdrop of domestic law," and there is no "exclusionary language" in the Convention prohibiting the defenses from even being considered.

Another backdrop aspect of domestic law is the statute of limitations. Under the Federal Arbitration Act, which implements the Convention, petitions to confirm a Convention award must be brought within three years from when the award is made. *See* 9 U.S.C. § 207; *Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co. v. Navimpex Centrala Navala*, 989 F.2d 572, 581 (2d Cir. 1993) (directing dismissal of petition as untimely). The Convention makes no mention of defenses to enforcement based on a statute of limitations. Yet, so far as we are aware, no U.S. court has held that a petition can be brought for an indefinite period after the award is issued.

This Court's case law leans strongly in the direction of the authorities discussed above. In *Base Metal Trading, Ltd. v. OJSC "Novokuznetsky Aluminum Factory,"* 283 F.3d 208 (4th Cir. 2002), this Court dismissed a Convention application on personal jurisdiction grounds. Personal jurisdiction is not an enumerated ground to refuse enforcement; it is a procedural defense. *See*, *e.g.*,

29

*Cent. States, Se. & Sw. Areas Health & Welfare Fund v. First Agency, Inc.*, 756 F.3d 954, 959 (6th Cir. 2014) (describing lack of personal jurisdiction as a "procedural defense[]"); *Hendricks v. Bank of Am., N.A.*, 408 F.3d 1127, 1135 (9th Cir. 2005) (same). The *Base Metal* court did not offer a detailed rationale for why it believed it could dismiss on jurisdictional grounds; it stated only that the Convention "does not confer personal jurisdiction when it would not otherwise exist." 283 F.3d at 212. But the best reading of *Base Metal* is that the personal jurisdiction is protected by the Convention's authorization for applying the enforcing court's "rules of procedure."

That was the rationale the Second Circuit set forth when it later cited and followed *Base Metal* in likewise concluding that it could consider a personal jurisdiction defense. The court explained that that the Convention's enumerated defenses "pertain to *substantive* matters rather than to procedure." *Frontera Res. Azerbaijan Corp. v. State Oil Co. of Azerbaijan Republic*, 582 F.3d 393, 397 (2d Cir. 2009) (citation omitted) (alteration in original).[3]

---

[3] *See also* Aristides Diaz-Pedrosa, *Shaffer's Footnote 36*, 109 W. Va. L. Rev. 17, 24 (2006) (citation omitted) (stating that persona jurisdiction requirements in Convention cases arise because the Convention requires enforcement "in accordance with the rules of procedure of the territory where the award is relied upon"); Restatement (Third) U.S. Law of Int'l Com. Arb. § 5.6 TD No. 5 cmt. a (ii) (2017) (stating that the Convention "borrow[s] . . . the rules of procedure that are generally applicable in the courts that are called upon to enforce Convention awards; requirements of personal jurisdiction may be viewed as such rules of procedure").

The District Court tried to distinguish *Base Metal* as involving a question about its authority "to proceed to an adjudication." (JA1575 (citation omitted).) But it is unclear why that matters. All manner of other procedural defenses (except perhaps a non-waivable defense like subject matter jurisdiction) could be characterized as concerning a court's authority to proceed. Rule 19, for example, removes the authority to "proceed to an adjudication" if necessary parties are lacking. The more salient point is that personal jurisdiction is a defense not explicitly listed as a defense under the Convention. And *Base Metal*'s dismissal on that ground underscores the error of the District Court's "bottom line" that there are "seven **exclusive** defenses to enforcement." (JA1576 (emphasis added).) Not so. There are only seven *substantive* defenses, but procedural rules remain, even where their application mandates dismissal.

The Fourth Circuit's approach fits comfortably with case law elsewhere.

The First Circuit has held that District Courts retain the power to stay an application to confirm under the Convention pending a separate arbitration, despite a lack of explicit authority in the Convention's list of defenses. *Hewlett-Packard Co. v. Berg*, 61 F.3d 101, 106 (1st Cir. 1995). The court explained that Congress's adopting of the Convention was not intended as "major departure from the ordinary rule" that courts have the inherent power to stay proceedings. *Id.*

District Courts outside the Fourth Circuit have likewise applied procedural rules in dismissing Convention applications on procedural grounds not enumerated in the convention. *Intervest Int'l Equities Corp. v. Aberlich*, No. 12 Civ. 13750, 2013 WL 1316997, at *2 (E.D. Mich. Mar. 29 2013) (Rule 19 joinder); *Termorio S.A. E.S.P. v. Electrificadora Del Atlantico S.A. E.S.P.*, 421 F. Supp. 2d 87, 92, 104 (D.D.C. 2006) (*forum non conveniens*); *Orange Middle E. & Africa v. Republic of Equatorial Guinea*, Civ. Action No. 15 Civ. 849 (RMC), 2016 WL 2894857, at *1, 2 (D.D.C. May 18, 2016) (failure to serve a sovereign under the special service provisions of the Foreign Sovereign Immunities Act).

Against this heavy weight of authority, neither the Estate, nor the District Court, has cited *any* case holding the procedural defenses are categorically unavailable in Convention cases.

### 4. There Is Every Practical Reason to Make Available Procedural Defenses to Domestic Targets of Enforcement Petitions

As a matter of fundamental fairness, targets of Convention petitions, such as Ms. Yu, should be afforded the same procedural protections as litigants in domestic arbitrations or any other type of case.

Article III of the Convention reflects a similar principle, by providing that the enforcing court cannot impose "substantially more onerous conditions" than those that would apply to a enforcing a domestic award. New York Convention,

32

art. III. This rules embodies a common sense notion of parity: Convention petitioners should be on equal footing, and not disadvantaged, in domestic courts.

By the same logic of parity, the *targets* of Convention petitions should not be disadvantaged, either. A domestic defendant or respondent can avail itself of the full range of procedural defenses (improper service, improper venue, etc.), but there is no reason why all these doctrines should suddenly vanish just because the proceeding arises under the Convention.

Here, Ms. Yu is U.S. citizen and resident, and, by the District Court's reading, the U.S. courts will jettison all manner of procedural doctrines that might spare her or other U.S. targets from, for example, needlessly inconvenient or harassing proceedings (*forum non conveniens*), or proceedings that lack essential participants (Rule 19).

The Estate is improperly pursing selective enforcement against Ms. Yu *personally* for recovery of what were fundamentally corporate obligations, and doing so in a manner that exposes her to serious peril under Chinese law. In an ordinary litigation, a District Court could at least *consider*, under available procedural doctrines, the highly abusive way the Estate framed its case (only against Ms. Yu personally) and the highly suspicious forum where it chose to sue (in Maryland, whose courts cannot reach the other parties). This Court should not adopt a rule that forecloses all inquiry into these sorts of issues.

33

### 5. There Is No Circuit Split, But Affirming Would Create One

The District Court stated that there is a split between the Second and D.C.
Circuits on availability of procedural defenses (JA1574), but that is simply
incorrect. None of the cited D.C. Circuit cases actually holds that *forum non
conveniens* or other procedural rules are categorically unavailable in Convention
cases. To the contrary, the D.C. Circuit has explicitly declined to "consider [the]
contention that, contrary to the Second Circuit's decision [in *Monegasque*], the
[*forum non conveniens*] doctrine has no place in an action to enforce an arbitration
award." *TMR Energy Ltd. v. State Prop. Fund of Ukraine*, 411 F.3d 296, 304 n\*
(D.C. Cir. 2005). Affirming would needlessly *create* a circuit split.

To be sure, the *TMR* court took a narrow view (narrower than the Second
Circuit) of the circumstances in which a *forum non conveniens* defense should
prevail in an award-enforcement case. Specifically, the court found that the
necessary element of an adequate alternate forum is generally missing in such
cases because "only a court of the United States (or of one of them) may attach"
property that is "located in the United States." *Id.* at 303. Ruling otherwise would
allow a respondent to evade the award by hiding assets in the United States.

But, importantly, the *TMR* court did not hold that the *forum non conveniens*
defense is categorically unavailable in award-recognition cases. By contrast, Judge
Grimm refused to consider Ms. Yu's *forum non conveniens* defense altogether on

34

the basis that it was off-limits. Regardless, the holding in *TMR* would be inapplicable here, because (i) Ms. Yu has not only tried repeatedly to pay in China, but has in fact, initiated litigation in Hong Kong under common law in an effort to ensure the complete and orderly carrying out of the Award (including the payment obligations on all sides), (ii) Ms. Yu has more than sufficient assets in Hong Kong and China to pay the award, and (iii) the major components of the Award contemplate not payments but specific performance obligations.

### 6.  The Availability of Procedural Defenses Does Not Undermine the Pro-Enforcement Thrust of the Convention

The Estate may argue that entertaining procedural defenses will needlessly impede enforcement proceedings, against the pro-enforcement spirit of the Convention and U.S. law, but that is simply not so. In the typical, run-of-the-mill enforcement case—where, for example, the losing party subject to U.S. jurisdiction has assets in the United States but will not voluntarily pay the award—the defenses at issue here would falter from the start, as they did in the *TMR* case discussed above.

Consider as an example of the more typical case, *Crescendo Maritime Co. v. Bank of Communications Co.*, 15 Civ. 4481 (JFK), 2016 WL 750351 (S.D.N.Y. Feb. 22, 2016), where the court rejected the *forum non conveniens* arguments of a foreign bank that lost an arbitration award in London of $18.6 million, and that maintained assets of $4.8 billion in New York. *Id.* at *1, *3. The underlying events

had little connection to the United States, but that did not matter. Given the summary nature of the proceedings, the court found, "the usual difficulties associated with conducting discovery or trial abroad are not implicated in this case." *Id.* at *8.

Here, by contrast, the Award involves primarily complicated and vague specific performance directives. Sorting out exactly who must take what steps under those vague directives *will* require the Court to receive evidence in the form of documents, witnesses testimony and the like. For cases with unusual fact patterns like this one, the Court should not categorically foreclose procedural defenses that would otherwise be justified.

### C.    Reversal on this Issue Warrants a Remand

If the Court agrees that procedural defenses *are* available, then it need not go further, and should remand to the District Court to consider the procedural defenses anew. While this Court has the authority to affirm on an alternate ground not reached by the District Court, it is generally "more appropriate to allow" the District Court consider arguments it did not originally reach "in the first instance on remand." *Q Int'l Courier Inc. v. Smoak*, 441 F.3d 214, 220 n.3 (4th Cir. 2006); *see also*, *e.g.*, *EEOC v. Am. & Efird Mills, Inc.*, 964 F.2d 300, 302 (4th Cir. 1992) (remanding where District Court had not reached an issue). There are three additional factors that make a remand especially appropriate.

36

First, the procedural defenses at issue are reviewed for abuse of discretion, *Dmarcian, Inc. v. Dmarcian Europe BV*, 60 F.4th 119, 136 (4th Cir. 2023) (*forum non conveniens*); *Gunvor SA v. Kayablian*, 948 F.3d 214, 219 (4th Cir. 2020) (Rule 19). That standard is "designed to provide deference to the decisions of a district court," and therefore Courts of Appeal "should be more reluctant to address in the first instance issues which that standard of review applies." *Peer v. Lewis*, 606 F.3d 1306, 1313 (11th Cir. 2010) (quotation marks and citation omitted).

Second, the District Court should be afforded a chance to exercise its discretion here because the issues involve a lengthy record and complex factual issues more suited to what District Courts are accustomed to doing.

Third, and relatedly, the Hong Kong litigation is proceeding in real time, and so the District Court, on remand, would have available a more up-to-date record on which to make the necessary discretionary judgments.

Should this Court nonetheless consider the merits of the defenses, the record supports dismissal or, at a minimum, a stay or an evidentiary hearing.

## II. The Amended Petition Should Have Been Dismissed or Stayed

### A. Standard of Review

As mentioned, the procedural defenses at issue are ordinarily reviewed for abuse of discretion. However, the District Court did not address the merits of either one, and so there are no factual findings that can be reviewed under that standard.

In these circumstances, appellate review is *de novo*. *Bangura v. Hansen*, 434 F.3d 487, 497 (6th Cir. 2006); *Jones v. Caddo Parish Sch. Bd.*, 735 F.2d 923, 926 n.2 (5th Cir. 1984) (en banc).

### B.    The Court Should Dismiss or Stay Under *Forum Non Conveniens*

This case presents the paradigm set of circumstances for *forum non conveniens* dismissal (or, at a minimum, a stay).

### 1.    Standard for *Forum Non Conveniens*

Federal courts may dismiss a case on *forum non conveniens* grounds if there is an alternate forum that is (i) "available," (ii) "adequate" and (iii) "more convenient in light of the public and private interests involved." *Jiali Tang v. Synutra Int'l Inc.*, 656 F.3d 242, 248 (4th Cir. 2011) (citation omitted).

The "private" interests refer to factors bearing on whether the case will be "easy, expeditious and inexpensive," such as the location of witnesses or evidence. *Id.* at 249 (citation omitted). The "public" interests are those that implicate the relevant countries' systems of justice more broadly, such as the "local interest in having localized controversies decided at home," and the "avoidance of unnecessary problems in conflict of laws, or in the application of foreign law." *Id.*

The Court is empowered to impose conditions to dismissing on *forum non conveniens* grounds, or to stay the proceedings in lieu of outright dismissal. *Hewlett-Packard*, 61 F.3d at 105-06 (remanding for District Court to consider

staying Convention petition); 14D Charles Alan Wright, *et al.*, Federal Practice and Procedure § 3828 (4th ed. 2013) (courts "may dismiss (or stay) the case under the ancient doctrine of *forum non conveniens*"); *Compania Naviera Joanna SA v. Koninklijke Boskalis Westminster NV*, 569 F.3d 189, 205 (4th Cir. 2009) (modifying *forum non conveniens* dismissal to be conditioned on moving party waiving any statute of limitations defense in foreign proceeding).

## 2.     Hong Kong Is An Appropriate Forum

The Court need not speculate about whether there *could be* an adequate forum because there are ongoing court proceedings in Hong Kong, the seat of the arbitration. (JA1922-1965.) The Hong Kong Court is undeniably the only court with jurisdiction over all parties involved in the arbitration, and has primary jurisdiction to supervise the performance of the award with a range of common law remedies. The decision of the Hong Kong Court will have significant impact on whether and how the Estate can pursue enforcement steps under the Award elsewhere. The Hong Kong case has rejected the Estate's efforts to avoid reaching the merits of how the award should be enforced, and is squarely poised to make additional progress. Moreover, having already addressed specific substantive issues, it is further along than the District Court.

39

### 3.    The Private Factors Support Dismissal

The contract at issue was executed in China, and written in Chinese. (JA23-30.) The dispute was arbitrated in Hong Kong, in Mandarin, and enforcing the Award involves issues that—as proven by five years' of disputes—are already complex, and that will be dramatically more so if they have to be sorted out halfway across the globe, in another language, without even subpoena power over key parties and witnesses, and before a Court that does not routinely deal with Chinese law. This sort of fact pattern should merit dismissal on *forum non conveniens* grounds. *See Jiali*, 656 F.3d at 252 (dismissing case where "most of the evidence and witnesses are in China" and because proceedings in the U.S. would "require costly translators").

As discussed, the Hong Kong action has "remedial flexibility" and thus can actually take practical steps to advance the matter towards resolution. Certain of the specific performance steps can be carried out in multiple ways, consistent with broad language of the Award, and the Hong Kong court is best suited to manage a fair and efficient process. Compare that to the District Court proceedings, where the court would be wielding only the blunt instrument of contempt sanctions if the Estate deems the specific performance orders are not being performed by exactly

the means it believes are required by the Award. The particular challenges associated with enforcing each Order here in the United States are vast:[4]

**Property Swap (Orders 1 and 2)**. There is ongoing dispute about how to exchange properties located in China, consistent with Chinese real estate law, and about how to do so and obtain the appropriate regulatory approval. (JA551-554 ¶¶ 14-16.) These issues cannot be feasibly resolved in the United States. They are squarely presented in the Hong Kong proceeding (*see* JA1941-1943 ¶¶ 42-47), which is where they belong.

**SJHC Transfer (Orders 4-7)**. The most hotly contested aspect of the Award is how to carry out the SJHC transfer. Here, too, the parties are not aligned. The Hong Kong court is well-suited to sort out these disputes because all the parties are before it, and, under the broad powers of a common law action, it is empowered to liquidate SJHC and distribute the proceeds, if necessary. (JA1961-1963.) How a court in Maryland could possibly adjudicate or even make progress on these disputes is difficult to fathom.

---

[4] Ms. Yu disputes that all the Orders are enforceable against her personally, but the Estate has argued otherwise, and has made clear that, in fact, it intends to seek specific performance from her. (JA362; JA366 (accusing Ms. Yu of having "refused to comply with nearly all of her obligations under the nine Orders," including the "specific-performance Orders" and seeking an Order that Ms. Yu must "comply with the specific performance orders that [she] is required to complete").). The potential for mischief triggered by enforcement proceedings in the United States is undeniable.

**Damages Payment (Order 9)**. Ms. Yu has tried to make this payment repeatedly, only to be rebuffed by the obstinate non-cooperation from the Estate, which implausibly contends it cannot receive funds in China (*see* Statement of the Case § F, *supra*) and which flippantly argues (with no evidence) that there are no legal risks to Ms. Yu in paying a Chinese obligation outside the country. Clearly, the Hong Kong court is better suited to resolve these issues as well, and in fact has specifically agreed to hear them. *Hongbiao*, 2023 WL 11576 ¶ 50(c).

**Final Payment (Order 8)**. This payment is concededly due only if and when the other steps are completed. (JA1193 n.5.) The Hong Kong court is far better suited to deciding when and if such payment conditions are met.

### 4.    The Public Factors Support Dismissal

The "public" factors strongly point in the same direction, as the U.S. legal system has little to no interest in a controversy where, due to the nature of the Award and the absence of key participants, its capacity to be productive is minimal. As discussed, the District Court would be put in the impossible position of trying to make sense of the vague arbitral language, and then enforcing it against only a portion of the responsible parties, under unfamiliar laws. Nor does the U.S. legal system have an interest in the type of abusive targeting of U.S. citizens for selective enforcement that the Estate has undertaken here.

42

There is also a separate and overarching "public" factor that favors dismissal: this petition amounts to an attempt by the Estate to evade Chinese currency restrictions. A highly instructive case in this regard is the Second Circuit's decision in *Figueiredo Ferraz E Engenharia de Projeto Ltda. v. Republic of Peru,* 665 F.3d 384 (2d Cir. 2011), which dismissed, on *forum non conveniens* grounds, a petition to confirm an arbitral award against an agency of the Peruvian government. *Id.* at 391-93. The agency was gradually paying the award in Peru, limited by a Peruvian law capping the amount it could pay towards an award at three percent of its budget per year. *Id.* at 387. The petitioner, in a transparent attempt at circumventing that law, sought enforcement in this country.

The Second Circuit found that that there was a strong "public interest in assuring respect for a sovereign nation's" own laws, and that this "highly significant public factor" tipped the "balance decisively against the exercise of jurisdiction in the United States." *Id.* at 392. Dismissal was hardly an unfair result, the court observed, because the petitioner chose to enter "into a contract with . . . an organ of the Peruvian government," knowing that any award would be "subject to the cap statute." *Id.* at 393.

The facts here are strikingly similar. Mr. Ke entered into a contract with Chinese counterparties concerning Chinese real estate, knowing that aspects involving China (such as the exchange of Chinese properties), would be subject to

Chinese currency restrictions. Consistent with the reasoning of *Figueiredo*, this Court should show respect for China's currency exchange laws, and should not lend a hand to the Estate trying to evade them.

### C. The Court Should Dismiss for Failure to Join Necessary Parties Under Rule 19

#### 1. Standard Under Rule 19

Federal Rule of Civil Procedure 19 states that parties are deemed "required" in an action if their absence leave the court unable to provide "complete relief among existing parties" or would expose the parties to "a substantial risk of incurring double, multiple, or otherwise inconsistent obligations." Fed. R. Civ. P. 19(a)(1). If absent parties cannot be joined, the District Court must consider whether to dismiss the case, based on (among other things) whether the prejudice from the lack of necessary parties can be mitigated or whether there would be an adequate remedy elsewhere. Fed. R. Civ. P. 19(b).

#### 2. The Absent Parties Are "Required"

The Estate has failed to join Oasis, which is referred to and subject to obligations in six of the nine Orders, and the Estate's co-claimant, Mr. Xu, who is referred to collectively with the Estate in all nine Orders. (JA204-205.) These are all required parties, because, without them, the interrelated and sequenced specific performance provisions cannot possibly be enforced in a manner that provides

complete relief, or that provides fairness and finality. This conclusion is supported by two principles that the federal courts have widely recognized.

First, for cases "seeking specific performance of a contract," all the parties that "will be required to act to carry out a court order compelling performance have been held to be" indispensable parties under Rule 19. 7 Charles Alan Wright, *et al.*, *Federal Practice & Procedure* § 1613 (3d ed. 2023). The logic is straightforward: "where [an] absent party plays a significant role in the provision of some form of injunctive relief" the court cannot afford "complete relief" without that party. *Rose v. Simms*, 95 Civ. 1466 (LMM), 1995 WL 702307, at *3 (S.D.N.Y. Nov. 29, 1995).

Here, without Oasis (the company at the heart of this dispute) or Mr. Xu, the Court cannot possibly ensure that the various transactions the parties are supposed to undertake are completed properly.

Second, Mr. Xu is a necessary party because all the alleged obligations the Estate seeks to enforce in this proceeding are jointly owed to Mr. Xu, as well. All parties to whom obligations ares jointly owed "usually have been required to be joined under Rule 19(b) and their nonjoinder has led to a dismissal of the action." 7 Charles Alan Wright *et al.*, *Federal Practice & Procedure* § 1613 (3d ed. 2023). That is because leaving out an obligee places the defendant at risk of multiple suits, and deprives the defendant of a "complete and final decree between all parties

45

interested." *Bry-Man's, Inc. v. Stute*, 312 F.2d 585, 587 (5th Cir. 1963). *See also* 4 James Wm. Moore, Moore's Federal Practice § 19.06[3] (2018) (courts generally "dismiss rather than proceed without co-obligees whose joinder is not feasible").

Here, an acute problem for Ms. Yu arises from the fact that all the Orders concern the two claimants *jointly*, but one claimant is not before the District Court (or this Court). Any implementation of the Award by the District Court could subject Ms. Yu to conflicting demands or litigation from Mr. Xu if he has different views of the parties' obligations. This is a real concern because the Estate and Mr. Xu have spent years fighting with one another on these exact issues. (JA438-440 ¶¶ 23-27; JA538-938.)

### 3. Dismissal is the Appropriate Remedy

Dismissal is the appropriate remedy because there is no practical way to "lessen[] or avoid[]" the issues detailed above, nor any way to make a judgment "adequate." Fed. R. Civ. P. 19(b). And there is, of course, an otherwise "adequate remedy," *Id.*—namely, the Estate's ability to argue how the Award should be enforced in the ongoing Hong Kong litigation.

## III. The District Court Should Have Refused Enforcement of Order 9 As Violating Public Policy

### A. Standard of Review

The District Court's application of the Convention's public policy defense to recognition of the Award is reviewed *de novo*. *Indus. Risk Insurers v. M.A.N.*

*Gutehoffnungshütte GnbH*, 141 F.3d 1434, 1443 (11th Cir. 1998) (reviewing *de novo* application of the Convention's public policy exception); *accord W.R. Grace & Co. v. Local Union, 759*, 461 U.S. 757, 766 (1983) ("[T]he question of public policy is ultimately one for resolution by the courts.").

Further, because a petition to confirm award is "akin to a motion for summary judgment," *D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 109 (2d Cir. 2006), this Court should draw "all reasonable inferences in favor of the appellant," *Roe v. Doe*, 28 F.3d 404, 407 (4th Cir. 1994), at least absent a hearing, and should consider only properly admissible evidence—not the conclusory and unexplained speculations of the Estate. *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 962 (4th Cir. 1996) ("summary judgment affidavits cannot be conclusory or based upon hearsay") (citation omitted); *LGC Holdings, Inc. v. Julius Klein Diamonds, LLC*, 238 F. Supp. 3d 452, 469 (S.D.N.Y. 2017) (excluding hearsay and unsubstantiated assertions in Convention proceeding).

**B.    Enforcement of Order 9 in the U.S. Would Violate The Public Policy of International Comity**

Under the New York Convention, "[r]ecognition and enforcement of an arbitral award may . . be refused" if it would "contrary to the public policy" of the enforcing country." New York Convention, art. V(II)(b). While the "standard is high"—an award violates public policy only if it "'tends clearly' to undermine the public interest, the public confidence in the administration of the law, or security

47

for individual rights of personal liberty or of private property," *TermoRio S.A. E.S.P. v. Electranta S.P.*, 487 F.3d 928, 938 (D.C. Cir. 2007) (citation omitted)—it is met here. As discussed, requiring Ms. Yu to pay the award outside China would place Ms. Yu at severe legal risk in China.

Enforcing the award under these circumstances would violate the fundamental U.S. policy of international comity, which "refers to the spirit of cooperation in which a domestic tribunal approaches the resolution of cases touching the laws and interests of other sovereign state." *Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Court*, 482 U.S. 522, 543 (1987). Under comity principles, courts should show "due respect" for the "special problem[s]" that may arise from being a litigants exposed to risk under foreign laws. *Id*. at 546.

This Court has recently explained the stakes as follows: "If American judges trample on or overlook the laws and sovereign claims of other countries, we inevitably invite retaliation against American companies and fuel an inhospitable climate for American businesses seeking to expand their markets and enterprises abroad." *Dmarcian*, 60 F.4th 147.

These concerns can also be viewed from a personal level. Ms. Yu is a U.S. citizen who deserves due regard in U.S. courts for the risks that would fall to her if Order 9 is enforced here. She is a native of China, with a home and a business

48

there, but enforcing Order 9 would place her at severe legal peril any time she returned.

International comity principles have been applied specifically in the context of denying enforcement under the New York Convention's public policy ground. In *Victrix S.S. Co., S.A. v. Salen Dry Cargo A.B.*, 825 F.2d 709, 715-16 (2d Cir. 1987), the court refused to enforce a British award because doing so would have disrupted a Swedish bankruptcy proceeding. Citing *Victirx* (among other cases), a leading commentator on the New York Convention concluded that courts should not enforce awards where doing so "would violate a fundamental public policy of a state (other than the forum state) with a materially greater connection to the matter." Gary B. Born, International Commercial Arbitration 3666, § 26.05[C][9][f] (3d ed. 2021).

That is precisely the situation here: China has "a materially greater connection to the matter," *id.*, and enforcing the award here would violate its currency control laws. *See also Venture Global Engineering, LLC v. Satyam Computer Servs., Ltd.*, 233 F. App'x, 517, 523 (6th Cir. 2007) (noting that "a showing that the enforcement of the Award would violate Indian law may well present a cognizable defense under the Convention," though ultimately concluding that "Indian law would actually not be violated by the enforcement of the Award").

In rejecting Ms. Yu's public policy defense, the District Court's most glaring error was to overlook the evidence Ms. Yu submitted. Specifically, the District Court's decision states: "Stephany Yu simply asserts, **without citing any authority**, that she might be placed at legal risk for potentially violating China's currency control laws . . . ." (JA1578 (emphasis added).) It is simply incorrect to say that Ms. Yu cited no authority.

In fact, Ms. Yu provided translations of the relevant Chinese laws and regulations, along with two detailed expert declarations explaining their implications for Ms. Yu. (JA971-1156; JA1295-1539.) Of most concern, Chinese law prohibits making or receiving payments in foreign currency "where such funds should be collected or paid in Renminbi." (JA977 ¶ 13; JA1073.) Chinese law also broadly prohibits "evading . . . the State's control over foreign exchange . . . by any . . . means." (JA979 ¶ 18 JA1134.) As discussed, Chinese regulators would take issue with a Chinese-centered debt being paid abroad—which is to effectively take currency out of China without regulation.

The evidence that the District Court overlooked was, essentially, unrebutted. In the District Court proceedings, the Estate's only answer was a conclusory portion of a declaration from a Chinese lawyer who opined that "China's foreign currency control applies only to transactions within China (or related to Chinese territory)." (JA1205-1206 ¶ 9.) No legal authority is cited for this position; it is the

bare say-so of the Estate's legal expert. Even if the unsupported statement were accurate, the Estate has never explained why the parenthetical phrase "or related to Chinese territory" would not encompass Order 9. After all, Order 9 is a damages payment related to Chinese real estate which, notably, the Panel *chose to denominate in RMB*, as opposed to the local Hong Kong currency. This fact alone should give the Court pause in accepting at face value any suggestion that payment was to be made wherever the Estate wanted.

The District Court's next mistake was to conclude that the judgment would not implicate Chinese law: "This Court is not being asked to enforce a judgment in China, but rather, in the United States, so any decision in this case would not undermine the interests of China in enforcing its own currency control laws." (JA1578.) This conclusion, respectfully, misunderstands that enforcing a judgment in the United States that settles a debt based in China is an indirect way of causing money that would otherwise stay in China to leave the country—similarly, for example, to the owner of a building in China asking tenants to pay rent to bank accounts abroad. These sorts of schemes run headlong into broadly-phrased prohibitions under Chinese law. The District Court simply failed to grapple with the serious legal conflict its ruling would engender.

**IV.    Any Disputed Factual Issues Require a Hearing**

The District Court's decision primarily reflects legal conclusions that, as discussed, were in error. However, the District Court's decision also relied on, it appears, the resolution of factual issues *against* Ms. Yu, on issues that we respectfully submit should have been decided in her favor as a matter of law—namely, whether the Estate could accept RMB payments in China (it can) and whether Ms. Yu faces legal risks if she were to pay Order 9 outside China (she does). To the extent this Court finds that the record reflects genuinely disputed factual issues on these or other issues, the proper procedure was for the District Court to hold an evidentiary hearing, rather than summarily ruling against Ms. Yu.

A hearing would have been perfectly appropriate in this context. While petitions to confirm arbitration awards must be "made and heard in the manner provided by law for the making and hearing of motions." 9 U.S.C. § 6; *see also* 9 U.S.C. § 208 (adopting procedural provisions of 9 U.S.C. §§ 1-16 for Convention cases), motions involving disputed factual issues typically merit an evidentiary hearing. *See*, *e.g.*, *Alexander v. Indus. of the Blind, Inc.*, 901 F.2d 40, 41 (4th Cir. 1990) (holding that a "plenary evidentiary hearing [was] required" to consider conflicting testimony in connection with a motion to enforce an oral settlement); *cf. Silkworm Screen Printers, Inc. v. Abrams*, 978 F.2d 1256 (4th Cir. 1992) (table), 1992 WL 317187 (remanding for evidentiary hearing to determine if

52

parties agreed to arbitrate). We are aware of no authority for the notion that genuinely contested facts in Convention cases should be summarily decided on the papers alone.

**V.    To the Extent this Court Affirms the Entry of Judgment, the Judgment Should Be Modified to Be Denominated in the Currency of the Award, With a Directive that RMB Payments May be Made in China**

**A.    Standard of Review**

The question of whether the judgment should have been entered in one currency or another is a purely legal question, and hence (although we are aware of no case squarely on point) the issue should be reviewed *de novo*.

**B.    Any Judgment Should Mirror the Currency in Which the Parties Chose to Deal and in Which the Award Was Denominated**

While judgments in U.S. courts are typically entered in U.S. dollars, federal courts may "enter the judgment in the currency the parties themselves selected for their dealings, the currency in which the loss is felt." *Sea-Roy Corp. v. Parts R Parts, Inc.*, Nos. 98-1028, 98-1546, 1999 WL 111281, at *4 (4th Cir. Mar. 4, 1999) (citation omitted). A leading case, *Matter of Oil Spill by Amoco Cadiz Off Coast of France on March 16, 1978*, 954 F.2d 1279 (7th Cir. 1992), explains why there should be a "simple, uniform" rule of entering judgment in the currency the parties chose to deal:

> When all of the transactions occur in dollars, the judgment should be in dollars. Always. When they occur in some other currency, the award should be in that currency.

53

> Always. Certainty in this practice will enable the parties to hedge against currency risks. . . . Unpredictable currency choices or conversion dates create needless risk. A simple, uniform rule that the currency of the judgment matches the currency of the transactions will permit the parties to handle the risks themselves.

*Id*. at 1329.

The rule in *Amoco* "accords with principles of fairness and with the goal of making injured parties whole because it provides them with payment in the currency for which they bargained." *Mitsui & Co. v. Oceantrawl Corp*., 906 F. Supp. 202, 204 (S.D.N.Y. 1995).

Adopting a different rule here would undermine the evident intent of the Panel, which chose to make careful distinctions between payments due in RMB and others due in Hong Kong Dollars. (JA204 (Order 9 in RMB); JA170-173 ¶¶ 232-33 (paragraphs incorporated by reference in Order 8 and calling for payment in Hong Kong Dollars).) Those same careful distinctions are reflected in the Panel's later award of fees and interest. (JA341 ¶¶ 42-44.) *See Leidos, Inc. v. Hellenic Republic*, 881 F.3d 213, 220 (D.C. Cir 2018) (upholding judgment in euros because, among other reasons, the petitioner "contracted in euros [and] received its arbitral award in euros").

Further, entering judgment in a foreign currency is particularly appropriate "if a judgment creditor refrains from pursuing remedies in the state where the obligation arose in anticipation of a more advantageous result in the United

54

States." Restatement (Third) of Foreign Relations Law § 823 cmt. c (1987). This scenario describes exactly the situation here. The Estate is playing games for a "more advantageous result"—namely to skirt Chinese currency control laws and avoid Chinese withholding taxes. The only fix for the Estate's games is to ensure that it gets what it bargained for, and no more, which is why the judgment should be clear that the RMB payments may be made, as Chinese law requires, in China.

The District Court swept aside these considerations altogether and instead announced a blanket rule whereby "a judgment in a foreign currency should be issued only when requested by the judgment creditor." (JA1580.) The quoted language is from *Continental Transfert Technique Ltd. v. Federal Government of Nigeria*, 603 F. App'x 1, 4 (D.C. Cir. 2015), which was apparently being read by to mean that judgment creditors have an absolute veto over judgments being entered in a foreign currency.

That is misreading of *Continental Transfert*. There, Nigeria lost an arbitration award and claimed, after judgment was entered, that it was unfairly surprised the District Court converted the damages to U.S. Dollars. *Id.* After all, Nigeria argued, "such relief was not explicitly requested in the complaint." *Id.* In rejecting Nigeria's arguments, the D.C. Circuit held that the failure to request conversion was unremarkable because "a judgment in a foreign currency should be issued only when requested by the judgment creditor." *Id.* (citation omitted). In

55

other words, courts need not consider entering judgments in a foreign currency unless asked, given that the default rule is to enter judgment in U.S. Dollars.

However, the D.C. Circuit did *not* say—and we are aware of no other decision holding—that it is entirely up to the judgment creditor whether a judgment should be entered in the original currency or in U.S. dollars. Nor is there any reason to adopt such a peculiar rule. The underlying policy rationale for aligning the currency choice with the parties' expectations is applicable irrespective of the creditor's preferences. And in some cases—like this one—the creditor's preference will be based on tactical considerations (skirting Chinese law) that the Court should not endorse.

## CONCLUSION

For the stated reasons, the Court should reverse the District Court's judgment, and either remand for further proceedings or enter judgment for Ms. Yu.

## STATEMENT REGARDING ORAL ARGUMENT

Appellant Stephany Yu respectfully requests oral argument because this case presents important issues that may potentially trigger a circuit split, and because of the complexity of the case.

Dated: New York, New York
April 19, 2023

Respectfully Submitted:


STEPTOE & JOHNSON LLP

By: */s/ Charles Michael*
Charles Michael
1114 Avenue of the Americas
New York, New York 10036
(212) 506-3900
cmichael@steptoe.com

*Counsel for Appellant Stephany Yu*

# CERTIFICATE OF COMPLIANCE

This document complies with the limits of Fed. R. App. P. 32(a)(7)(B)(i) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 12,953 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2010, namely Times New Roman, 14-point type.

Dated: New York, New York
        April 19, 2023

_____
            */s/ Charles Michael*
            Charles Michael